**Opinion issued May 21, 2013.**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-12-00364-CV

———————————

**VILLAGE PLACE, LTD. AND BOB YARI, Appellants**

**V.**

**VP SHOPPING, LLC, Appellee**

---

**On Appeal from the 125th District Court**
**Harris County, Texas**
**Trial Court Case No. 2010-47980**

---

## O P I N I O N

Village Place, Ltd. purchased the Village Shopping Center with a non-recourse promissory note secured by a deed of trust pledging the property as collateral. The deed of trust included provisions that under certain circumstances created exceptions to the non-recourse nature of the loan. Bob Yari guaranteed the

loan. When Village Place defaulted, VP Shopping, LLC (VPS), the noteholder at the time, foreclosed on the pledged shopping center, leaving an unpaid balance of over $1.8 million. After subtracting the foreclosure proceeds, the remaining unpaid principal and interest on the loan was $379,234. VPS did not seek to recover this unpaid loan balance[1] because the loan was non-recourse; instead, it sought and obtained a judgment holding Village Place and Yari jointly and severally liable for, generally speaking, two categories of damages it claims it suffered as a result of Village Place's failure to comply with obligations created by the exceptions to the non-recourse provisions: (1) $109,720.90 for its out-of-pocket expenses and (2) $554,258.60 for the reduction in value of the collateral, primarily Village Place's failure to maintain the property. The trial court awarded both measures of damages and entered judgment awarding VPS $663,979.50 in damages, attorney's fees, and court costs.

On appeal, Village Place contends that the trial court erroneously awarded "a windfall" of almost $300,000 more than the unpaid loan balance.[2] Village Place raises five issues but primarily argues that the trial court's damages award was

---

[1]    We use the phrase "unpaid loan balance" to refer to the unpaid principal and interest.

[2]    Village Place and Yari filed one brief, and Yari joins in all of Village Place's contentions. Because Village Place is the signatory on the note and deed of trust, we will refer to the arguments concerning these documents and the amount of liability under the documents as arguments of Village Place. The arguments regarding the construction of the guaranty are made by Yari alone.

wrong for two reasons: (1) recovery under the portion of the indebtedness that was converted from non-recourse to recourse under the provisions of the loan documents creating exceptions to the non-recourse nature of the loan was limited or capped by the amount of the unpaid loan balance (i.e., $379,234) and (2) it was entitled to an offset for the fair market value of the pledged shopping center rather than an offset for the foreclosure price. VPS contends that it seeks to collect the amount of "full recourse carveout liabilities" created by the exceptions to non-recourse provisions in the loan documents and those amounts are not capped at the amount of the unpaid loan balance. Alternatively, VPS contends that the price it paid at foreclosure represented the shopping center's fair market value.

We conclude that the carveout-liabilities provisions reinstate the personal liability that was removed by the non-recourse provisions of the loan documents for the amount of VPS's covered out-of-pocket expenses. For VPS's claim for reduction in value damages, however, the reinstated personal liability is capped at an amount equal to the unpaid loan balance. We further conclude that Village Place is entitled under Texas Property Code section 51.003 to have the property's fair market value determined and offset against VPS's claim.

On VPS's claims against Yari as the guarantor, we hold that Yari did not waive the statutory right to an offset granted to Village Place under Texas Property Code section 51.003.

We reverse in part the judgment's awards for damages and attorney's fees and remand for a new trial on the reversed portions of the award.

## Background

In May 1999, Village Place executed a promissory note payable to non-party Salomon Brothers Realty Corp. in the principal amount of $2.6 million to finance its purchase of the Village Place Shopping Center in Houston. The loan provided for monthly payments for ten years and a final balloon payment on June 1, 2009. Village Place also executed a deed of trust pledging the property as collateral for the note. Besides imposing on Village Place the obligation to "promptly pay when due the principal and interest on the indebtedness evidenced in the Note" (section 1), the deed of trust imposed several additional obligations, including: payment by monthly installments for annual taxes, insurance premiums, and "other Funds for other taxes, charges, premiums, assessments and impositions . . . which Lender shall reasonably deem necessary to protect Lender's interests," with such payments deposited into a fund maintained by the lender (section 2); an obligation to "not commit waste or permit impairment or deterioration of the Property" (section 6); an obligation "to restore or repair promptly and in a good and workmanlike manner all or any part of the Property to the equivalent of the Pre-existing Condition" (section 6); and an assignment of rents and revenues generated from the property (section 26). The note and deed of trust generally were non-recourse with respect

4

to Village Place's obligations; however, the instruments indicated several exceptions, or carveout liabilities, under which Village Place could become personally liable.[3]

---

[3] The note and deed of trust contain a virtually identical provision regarding the exceptions to non-recourse liability. The provision reads in pertinent part:

> Notwithstanding the foregoing provisions of this paragraph or any other agreement, [Village Place] shall be fully and personally liable for any and all:
>
> > (1) liabilities, costs, losses, damages, expenses or claims (including without limitation, any reduction in the value of the Property or any other issues, property or amounts which are collateral or security for the Loan) suffered or incurred by the [noteholder] by reason of or in connection with
> >
> > . . .
> >
> > > (b) any failure to pay taxes, insurance premiums (except to the extent that such taxes and insurance premiums are then held by the [noteholder]), assessments, charges for labor or materials or other charges that can create liens on any portion of the Property,
> > > (c) any misapplication of (i) proceeds of insurance covering any portion of the Property, or (ii) proceeds of the sale or condemnation of any portion of the Property,
> > > (d) any rentals, income, profits, leases and products received by or on behalf of [Village Place] subsequent to the date on which the [noteholder] gives written notice that a default has occurred under the Loan and not applied to the payment of principal or interest due under this Note or the payment of operating expenses (including any operator's, manager's, or developer's fee payable to [Village Place] or any affiliate of [Village Place]) of the Property,
> > > (e) any failure to maintain, repair or restore the Property in accordance with any Loan Document to the extent not covered by insurance proceeds made suitable to the [noteholder],

Simultaneous with the signing of the note and deed of trust, Yari executed a document entitled "Exceptions to Non-Recourse Guaranty." In this guaranty, Yari agreed to personally pay the amounts for which Village Shopping had liability under the exceptions to non-recourse liability. Furthermore, Village Place and Yari signed an Environmental Indemnity Agreement (EIA) that obligated them to indemnify the noteholder against any damages arising from the presence of hazardous materials on the property.

When the note matured in June 2009, Village Place made several payments but defaulted on the obligation to pay the entire remaining loan balance. The loan was not reinstated, renewed, or otherwise refinanced. One year later, in June 2010,

---

(f) any failure by [Village Place] to deliver to the [noteholder] all unearned advance rentals and security deposits paid by tenants of the Property received by or on behalf of [Village Place], and not refunded to or forfeited by such tenants,

(g) any failure by [Village Place] to return to, or reimburse the [noteholder] for, all personalty taken from the Property by or on behalf of [Village Place], except in accordance with the provisions of the instrument, and

(h) any and all indemnities given by [Village Place] to the [noteholder] set forth in the Environmental Indemnity Agreement or any other Loan Document in connection with any environmental matter resulting to the Property; and

(2) court costs and all reasonable attorneys' fees provided for in any Loan Document.

The guaranty obligated Yari to pay the amounts "for which [Village Place] may from time to time be personally liable" under the loan documents.

6

the note, deed of trust, guaranty, and EIA were assigned to VPS.[4] Soon thereafter, VPS purchased the shopping center through a foreclosure, having made the highest bid of $1.5 million. At the time of foreclosure, VPS's pre-foreclosure collection costs, accrued unpaid interest, and principal totaled $1,879,234. Thus, after subtracting the foreclosure purchase price, the remaining unpaid loan balance owed by Village Place was $379,234. Approximately ten months later, VPS sold the property to a third party for a gross price of $1,950,000.

VPS sued Village Place and Yari for breaches of the note, deed of trust, guaranty, and EIA. VPS alleged that Village Place and Yari personally were liable because some of the note's and deed of trust's exceptions to non-recourse liability had been triggered and, further, that they personally were liable under the EIA for certain environmental related costs.

In response, Village Place and Yari asserted that under Texas Property Code section 51.003 they were entitled to offset the property's fair market value against the "deficiency" on the loan. They also filed a "Motion to Determine the Fair Market Value of the Property and for Offset" pursuant to Texas Property Code section 51.003. Based on a report prepared by a certified general real estate appraiser, they asserted that the property's fair market value was $3,184,002.50 at the time of foreclosure. They requested that the trial court offset this amount "or

---

[4] ORIX, a real estate investment firm, created VPS as a special purpose entity to serve as the noteholder for foreclosure purposes.

7

such other amount as the Court may determine is the fair market value of the Property" against VPS's claims.

VPS replied that its suit was "<u>not</u> a suit for a deficiency following foreclosure" but rather sought the amounts due under the loan documents' exceptions to non-recourse liability. Therefore, VPS argued, these amounts are independent of the unpaid loan balance, section 51.003 was inapplicable, and the amounts should not be offset by either the value of the property or the foreclosure price. Alternatively, VPS argued that Yari's guaranty waived his rights to offset under section 51.003. In any event, VPS contended, the best evidence showed that the property's fair market value was $1.5 million, the same figure for which it sold at foreclosure.

After a pre-trial hearing on the motion for offset, the trial court denied the motion without explanation. The case proceeded to a three-day bench trial. At the outset of the second day of trial, the court altered course on the admissibility of the evidence on the property's value and announced that it would "go ahead and allow some testimony on this issue about valuation." Subsequently, the parties presented some evidence regarding the property's value at the time of the foreclosure. At the close of trial, the court rendered judgment awarding VPS damages amounting to $663,979.50 against Village Place and Yari jointly and severally, plus interest,

8

attorney's fees, and court costs. The court additionally ordered that Village Place and Yari take nothing on their counterclaims.

The court subsequently entered findings of fact and conclusions of law. The findings relevant to the $109,720.90 awarded for VPS's out-of-pocket expenses included the following:

- After receiving notices of default, Village Place failed in its obligation to turn over to VPS security deposits and rents from the property totaling $17,397.34 and $17,189.52, respectively.

- Village Place failed to pay $38,909.88 in taxes and $4,624.94 in insurance premiums, which VPS ended up paying.

- In breach of the EIA, Village Place failed to pay $12,997.50 for the costs of environmental testing reports.

- Village Place is liable for VPS's out-of-pocket expenses of $18,601.72 arising from various breaches of the loan documents, specifically, $10,164.51 in "miscellaneous expenses," $500 for a "REMIC opinion," $5,200 for a survey, and $2,737.21 for inspection/travel by VPS's representatives.

- Village Place's breach of the carveout-liability sections of the loan documents created liability for Yari under the guaranty.

The findings relevant to the $554,258.60 awarded for the reduction in value of the collateral included the following:

- Village Place caused damage "and/or" failed to repair and maintain the property in accordance with its obligations under the deed of trust, resulting in a reduction of the property's fair market value by at least $516,258.60.

- In breach of the EIA, Village Place failed to enroll the property into the State of Texas's Dry Cleaner Remediation Program, which caused the property's

9

fair market value to be reduced by at least $38,000—the cost of enrollment in the program.

The findings of fact and conclusions of law described these damages as "carveout liabilities" created under the note's and deed of trust's exceptions to non-recourse liability. With respect to Village Place's requested offset, the trial court found that VPS's "winning bid of $1,500,000 at the foreclosure sale in July 2010 was consistent with the property's fair market value at that time," and thus Village Place was "not entitled to an offset from the debt" owed by VPS.

Village Place and Yari filed a motion to modify the judgment, which was denied. They also filed a motion for new trial, which was overruled by operation of law. Village Place and Yari timely filed notice of appeal.

## Standard of Review

"Findings of fact in a case tried to the court have the same force and dignity as a jury's verdict upon questions." *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991); *see also Milton M. Cooke Co. v. First Bank & Trust*, 290 S.W.3d 297, 302 (Tex. App.—Houston [1st Dist.] 2009, no pet.). Thus, "the trial court's findings of fact are subject to sufficiency challenges under the same standards we apply to address the sufficiency of the evidence to support a jury's answer." *Milton M. Cooke Co.*, 290 S.W.3d at 302. "If findings of fact are not challenged, they are binding on the parties and on this Court." *In re K.R.P.*, 80 S.W.3d 669, 673 (Tex. App.—Houston [1st Dist.] 2002, pet. denied).

10

To determine whether legally sufficient evidence supports a challenged finding, we must consider evidence that favors the finding if a reasonable fact-finder could consider it, and we must disregard evidence contrary to the challenged finding unless a reasonable fact-finder could not disregard it. *See City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We may not sustain a legal insufficiency, or "no evidence," point unless the record demonstrates (1) a complete absence of evidence of a vital fact; (2) that the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) that the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) that the evidence conclusively establishes the opposite of the vital fact. *Id.* at 810.

In reviewing a challenge to the factual sufficiency of the evidence, we must consider and weigh all the evidence and should set aside the judgment only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Arias v. Brookstone, L.P.*, 265 S.W.3d 459, 468 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) (citing *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986)). The trial court acts as fact-finder in a bench trial and is the sole judge of the credibility of witnesses. *HTS Servs., Inc. v. Hallwood Realty Partners, L.P.*, 190 S.W.3d 108, 111 (Tex. App.—Houston [1st Dist.] 2005, no pet.).

We review conclusions of law by the trial court de novo and will uphold them if the judgment can be sustained on any legal theory supported by the evidence. *Noble Mortg. & Invs., LLC v. D & M Vision Invs., LLC*, 340 S.W.3d 65, 74–75 (Tex. App.—Houston [1st Dist.] 2011, no pet.). The trial court's conclusions of law are not subject to challenge for factual insufficiency, but we may review the legal conclusions drawn from the facts to determine their correctness. *Brown v. Brown*, 236 S.W.3d 343, 348 (Tex. App.—Houston [1st Dist.] 2007, no pet.).

The crux of this appeal is the meaning and application of contested provisions in the loan documents. "In construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument." *J.M. Davidson v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). We "examine and consider *the entire writing* in an effort to harmonize and give effect to *all the provisions* of the contract so that none will be rendered meaningless. No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument." *Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006) (quoting *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983) (emphasis in original) (citations omitted)). If the written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, then we construe the contract as

a matter of law. *Enter. Leasing Co. of Houston v. Barrios*, 156 S.W.3d 547, 549 (Tex. 2004) (per curiam) (citing *Coker*, 650 S.W.2d at 393).

### Village Place's Liability under the Exceptions to Non-Recourse Liability for Reduction in Fair Market Value Is Limited to the Unpaid Loan Balance

**A.    The parties' contentions**

Village Place contends as an initial matter that a "lender is entitled only to full payment of the loan" and that this governing general principle is reflected in the loan documents. In light of this principle, Village Place specifically argues that it has no personal liability under the non-recourse loan documents except for an amount capped at "the unpaid principal and interest *only to the extent of* the amounts that fall within the exceptions to the non-recourse provision that eliminates their personal liability." In other words, Village Place contends that its liability under the carveout-liabilities provisions is limited to the unpaid loan balance after the foreclosure sale: $379,234 (unless, per section 51.003 of the Property Code, that amount is lower because the fair market value of the property should be used to calculate the deficiency rather than the foreclosure price). Village Place contends that the trial court's award of $663,979.50 enabled VPS to impermissibly obtain a judgment for much more than the unpaid loan balance and put VPS in a better position than it would have been if Village Place had paid the loan in full.

13

VPS argues that the general principles do not control this contract dispute because those principles are not reflected in the loan documents. VPS did not seek a "deficiency judgment" based on the unpaid balance of the loan; rather, it seeks and is entitled to recover damages based on Village Place's default of the carveout-liability obligations created by the deed of trust. And what the full-recourse carveout-liabilities provision in the loan documents creates, according to VPS, is an obligation independent from the payment of the loan, enabling it to recover "for the debts caused by [Village Place's] specific breaches of the carveout obligations," including its contractual obligation to perform required maintenance, which caused the property's value to decline. VPS interprets the loan documents as allowing full, uncapped recovery for the carveout liabilities, including a reduction in the property's fair market value, "separate and apart" from the unpaid loan balance. Thus, the foreclosure sale price and the property's fair market value "have no relevance to any issue before this court." Village Place counters that this interpretation of the loan documents effectively gives VPS an "independent, free-floating claim" for carveout liabilities in contravention of the loan documents' language and Texas law.

**B.** **The loan documents create liability for certain out-of-pocket expenses incurred by VPS**

At the outset, we agree with VPS that the deed of trust obligates the borrower, Village Place, not only to pay the principal and interest on the loan but

also to pay for certain expenses associated with the property, such as taxes, insurance, and reasonable maintenance expenses. These contractual provisions are obligations that are "separate and apart" from the obligation to pay the loan. Accordingly, we conclude that Village Place would have personal liability for any damages suffered by VPS as a result of Village Place's breach of its obligations to pay the loan and to pay for certain expenses associated with the property but for the non-recourse provisions of the loan documents. [5]

## C. The loan documents do not afford VPS reduction-in-value claims against Village Place beyond the unpaid loan balance

The next question is whether the carveout-liabilities provisions of the loan documents reinstate personal liability for Village Place—liability that otherwise would not exist by virtue of the note's non-recourse provisions—for a reduction in the value of the property due to Village Place's failure to maintain it or enroll it in the dry cleaner remediation program. If so, VPS presented evidence that the shopping center's value decreased $554,258.60 at the time of the foreclosure due

---

[5]    Village Place does not challenge the specific components of the out-of-pocket expenses awards, namely: unremitted security deposits and rents, unpaid taxes and insurance premiums, costs for environmental reports, and VPS's other out-of-pocket expenses. Village Place does, however, interpret a clause in the guaranty prescribing the order in which foreclosure proceeds should be applied as extinguishing the entirety of the damages awards. We deem this portion of Village Place's argument as challenging the damages award as a whole without challenging the legal or factual sufficiency of particular components making up the entire damages award. We address this argument in the section of our opinion entitled "Liabilities Arising Out of the Non-Recourse Exceptions Are Not 'Other Expenses' to Which the Foreclosure Proceeds Should Have Been First Applied."

15

to Village Place's breach of these contractual obligations. The trial court found that these breaches caused the property's fair market value to decline by an identical amount.

The note and the deed of trust contain virtually identical provisions specifying exceptions to the general provisions of non-recourse liability—that is, liabilities that are reinstated. The paragraph begins by stating that "[s]ubject to the qualifications" described later in the paragraph, Village Place is liable "for payment and performance of all of the obligations" under the loan documents "to the full extent (but only to the extent) of all of the" pledged property. It then provides that if Village Place defaults, it shall not "be personally liable for the repayment of any of the principal of [or] interest on" the loan or "other charges or fee due in connection with the [l]oan [or] the performance of any covenants" created in the loan documents or "for any deficiency judgment." The paragraph then moves to what Village Place calls the "non-recourse exceptions" and what VPS and the trial court call the carveout liabilities (although neither phrase appears in the loan documents): "Notwithstanding the foregoing provisions of this paragraph," Village Place is "fully and personally liable" for (1) "any and all . . . liabilities, costs, losses, damages, expenses or claims (including without limitation, any reduction in value of the Property or any other issues, property or amounts which are collateral or security for the loan)", that are (2) "suffered or incurred by

16

[VPS]", (3) "by reason of or in connection with" one of several specified circumstances.

Village Place argues that decreases in the property's value can result in damages to the lender only up to the amount of the unpaid loan balance, but decreases beyond that point are not cognizable as damages to the lender. In other words, Village Place contends that with respect to VPS's claim for reduction in fair market value, the carveout-liabilities provisions reinstate liability only in part. We agree. These provisions reinstate Village Place's liability to the extent that VPS was damaged for breach of the obligations to maintain the property, and those damages are capped or limited by the amount of the unpaid loan balance. We conclude that the unpaid loan balance caps the liabilities reinstated by the carveout-liabilities provisions for reduction in value claims for the following three reasons.

### 1. VPS did not "suffer or incur" the reductions in the property's fair market value in excess of the loan deficiency

First, the loan documents tie the carveout liability to a loss or damage "suffered or incurred" by VPS, and VPS did not suffer an additional loss from the reduction in the shopping center's value over the unpaid loan balance (again, subject to offset for the property's fair market value).

The carveout-liability provisions reinstate liability when a reduction in the shopping center's value from inadequate maintenance or any other breach of

17

Village Place's contractual obligations covered by the carveout-liabilities provisions results in damages "suffered or incurred" by VPS. The words "suffered" and "incurred" are not defined in the loan documents. Therefore, we give them their "plain, ordinary, and generally accepted meaning unless the instrument shows that the parties used them in a technical or different sense." *Heritage Resources, Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996). "Suffer" in this context of a corporate person like VPS means "[t]o sustain injury, damage, or loss; to be injured or impaired." 17 THE OXFORD ENGLISH DICTIONARY 123 (2d ed. 1989). The word "incurred" has multiple meanings. *See, e.g.*, *Am. Indem. Co. v. Olesijuk*, 353 S.W.2d 71, 72 (Tex. Civ. App.—San Antonio 1961, writ dism'd) (surveying multiple meanings of "incur"). It can mean something akin to "brought on," "occasioned," or "caused." *See Schwab v. Schlumberger Well Surveying Corp.*, 198 S.W.2d 79, 81 (Tex. 1946) (interpreting "incurred" in statutory context). But in this context, that sense of the word is untenable because the carveout-liabilities provisions would operate to make Village Place and Yari liable for situations "brought on," "occasioned," or "caused" not by themselves but by VPS. Therefore, we construe "incurred" to have another common meaning often recognized in case law: to become liable to pay.[6] Thus, in order for a liability, cost, loss, damage,

---

[6]  *See Quick v. City of Austin*, 7 S.W.3d 109, 133 n.2 (Tex. 1999) (op. on reh'g); *Keever v. Finlan*, 988 S.W.2d 300, 308 (Tex. App.—Dallas 1999, pet. dism'd) (citing *Beasley v. Peters*, 870 S.W.2d 191, 196 (Tex. App.—Amarillo 1994, no

expense, or claim to trigger one of the specified exceptions to non-recourse liability, VPS must either sustain it or be liable to pay for it.[7]

VPS did not pay for the repairs or dry cleaner remediation program and did not incur any liability as a result of Village Place's failure to repair the property or enroll in the program. VPS might have sustained a loss due to Village Place's breach of these obligations, insofar as the property's impaired condition reduced the amount of foreclosure proceeds available to pay off the loan balance. But if the property had sold at foreclosure for more than the loan balance, VPS would have been required to pay the excess to Village Place; it was not VPS's to keep.[8] Here

---

writ)); *see also* BLACK'S LAW DICTIONARY 771 (7th ed. 1999) (defining "incur" as "[t]o suffer or bring on oneself (a liability or expense)"); 7 THE OXFORD ENGLISH DICTIONARY 835 (2d ed. 1989) (defining "incur" as "[t]o run or fall into (some consequence, usually undesirable or injurious); to become through one's own action liable or subject to; to bring upon oneself"). *Cf. Haygood v. De Escabedo*, 356 S.W.3d 390 (Tex. 2012) (analyzing meaning of "actually . . . incurred" in context of section 41.0105 of Texas Civil Practice and Remedies Code).

[7]    VPS's covered out-of-pocket expenses are losses "suffered" or "incurred" by VPS.

[8]    Not only is it a general principle that secured creditors do not keep the excess after foreclosure and application of the proceeds to the loan balance, *see First Nat'l Bank of Seminole v. Hooper*, 104 S.W.3d 83, 86 (Tex. 2003), but the deed of trust apparently contemplates this situation by providing:

> Trustee shall apply the proceeds of the [foreclosure] sale in the following order, (a) to all reasonable costs and expenses of the sale, including, but not limited to, reasonable and customary Trustee's fees, reasonable attorney's fees and costs of the title evidence; (b) to all sums secured by this instrument in such order as the Lender, in

19

the pledged property sold for less than the loan balance, but VPS's loss is not the reduction in value of the property, which it did not own before the foreclosure. Its loss is the damages it suffered as a result of Village Place's breach: the unpaid loan balance and its other out-of-pocket expenses covered by the carveout-liabilities provisions.[9] In other words, the carveout-liabilities provisions do not eliminate the necessity that VPS suffer damages for Village Place's breach of its contractual obligations, and the damages suffered by VPS function as a cap on Village Place's liability. To the extent that the pledged property's reduction in value from inadequate maintenance and failure to enroll in the dry cleaner remediation program exceeds the amount of the unpaid loan and covered expenses, VPS was not damaged.[10] In other words, the loss VPS "suffered or incurred" is the unpaid

---

Lender's sole discretion, directs, and (c) *the excess, if any, to the person legally entitled thereto*.

(Emphasis supplied.)

[9] The covered losses, based on the trial court's findings, are (1) $38,909.88 for taxes, (2) $4,624.94 in insurance premiums, (3) $12,997.50 for environmental testing reports, and (4) $18,601.72 for other out-of-pocket expenses.

[10] To illustrate, the decrease in value of the collateral was $516,258.60 due to failure to maintain the property and $38,000 for failure to enroll the property in the dry cleaner remediation program. Thus, the property would have been worth over $2,054,000 at foreclosure (not $1,500,000) if Village Place had satisfied these two contractual obligations. But VPS's loss was not $554,000; its loss was the unpaid loan balance and any covered expenses it incurred. The suffered or incurred limitation in the carveout liabilities provision, in effect, caps the reinstated liability to this amount.

20

loan balance plus its other covered expenses less the property's fair market value, and to that extent, and only to that extent, Village Place's liability is reinstated.

### 2. Nature of the loan documents

Second, the nature of a secured loan supports this interpretation. The rights granted to a secured creditor like VPS are for its protection, not for it to recover a windfall. And the interest it needs protecting is the repayment of the loan and payment of accrued interest and costs. *See First Nat'l Bank of Seminole v. Hooper*, 104 S.W.3d 83, 86 (Tex. 2003). A secured creditor usually does not

> own the collateral securing a debt; the creditor has no rights in the collateral except as necessary to protect the claim. The debtor continues to own the property; the secured creditor has only the right to force its liquidation for the sole purpose of paying the secured debt. A secured creditor is not entitled to collect more than the amount of the debt from such a liquidation of the collateral.

*Id.* (quoting *Anand v. Nat'l Republic Bank*, 210 B.R. 456, 459 (Bankr.N.D.Ill. 1997)). The carveout-liabilities provisions protect the lender who has made a loan based on its assessment that the pledged property's value is sufficient to cover its risk of non-payment. But the lender's risk increases when either (a) it pays other expenses out of pocket (such as insurance and taxes) or (2) the pledged property's value is reduced through the borrower's neglect. Both contingencies are covered by the carveout-liabilities provisions. If either of these contingencies occurs, the lender's additional damages are covered by our construction of the carveout-liabilities provisions. If this had been a recourse loan, VPS could have recovered

21

the difference between (a) the unpaid loan balance and its covered out-of-pocket expenses and (b) the fair market value of the collateral. VPS's interpretation would make Village Place liable for more: it would have to pay for a reduction in the collateral's value resulting from its inadequate maintenance and failure to enroll in the dry cleaner remediation program resulting in a reduction in the collateral's fair market value even if Village Place had paid off the entire loan. To allow VPS to recover more than these damages would grant it a windfall.

3.      **Avoidance of an absurd result**

Third, we agree with Village Place that VPS's interpretation of the loan documents would lead to absurd results. We avoid constructions that would lead to absurd results. *Kourosh Hemyari v. Stephens*, 355 S.W.3d 623, 626–27 (Tex. 2011) (per curiam); *Henry v. Masson*, 333 S.W.3d 825, 846 (Tex. App.—Houston [1st Dist.] 2010, no pet.). Furthermore, we construe contracts "from a utilitarian standpoint bearing in mind the particular business activity sought to be served" and "will avoid when possible and proper a construction which is unreasonable, inequitable, and oppressive." *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005) (quoting *Reilly v. Rangers Mgmt., Inc.,* 727 S.W.2d 527, 530 (Tex.1987)). VPS's position leads to an absurd result, as Village Place points out in its reply brief: based on this interpretation, if Village Place and Yari "failed to spend $500,000 in needed repairs, [VPS] would be entitled to recover that

22

$500,000—even if the property was sold at foreclosure for twice (or ten times) the amount owed under the loan."

We therefore conclude that the loan documents reflect the general principle that a lender is entitled only to full payment of the loan plus any other damages it incurs for breach of other contractual obligations by the borrower, and therefore the carveout-liabilities provisions cap Village Place's liability for reductions in fair market value. In other words, the carveout-liabilities provisions reinstate the right of the lender (or here noteholder) to recover for specific damages "suffered or incurred" by VPS, but those amounts cannot exceed the unpaid loan balance and any covered expenses incurred by the lender.

## Application of Property Code Section 51.003

### A. The parties' contentions

Having decided that VPS was entitled to recover for fair-market-value reductions up to the amount of the unpaid loan balance and any covered expenses, we now turn to whether Village Place was entitled to an offset for the fair market value of the shopping center. Village Place contends that section 51.003 of the Texas Property Code—which affords borrowers the right to a fair market valuation of foreclosed property and offset against creditors' "deficiency" claims—applies to this case, arguing that "this is a suit for a deficiency judgment that is permitted by the loan documents to the extent of the exceptions to the non-recourse provision."

23

VPS argues that it sued for and recovered carveout liabilities, not a "deficiency," and therefore section 51.003 has no application to this case. Anticipating this argument, Village Place maintains that the "breach of contract claim is predicated on, and limited to, the unpaid loan balance" and that section 51.003 applies. We conclude that VPS has in substance sued for recovery of the deficiency under 51.003.

## B. Section 51.003 applies to this case

The crux of the dispute over section 51.003's applicability is whether VPS has sued for a deficiency within the meaning of that statute. Texas Property Code section 51.003 implicitly defines "deficiency" as "the unpaid balance of the indebtedness secured by the real property" less "the price at which real property is sold at a foreclosure sale under Section 51.002." *See* TEX. PROP. CODE ANN. § 51.003(a) (West 2007). Subsection b provides that "[a]ny person against whom such a recovery is sought" may request a fair-market-value determination; subsection c provides the conditions and calculation for such an "offset against the deficiency." *See id.* § 51.003(b), (c). Thus, the statute's provisions are applicable in the context of an action to recover a deficiency, as that term is implicitly defined in the statute. *See Interstate 35/Chisam Road, L.P. v. Moayedi*, 377 S.W.3d 791, 797 (Tex. App.—Dallas 2012, pet. filed) (examining legislative history and observing

24

that statute "was designed to protect borrowers and guarantors in deficiency suits").

To determine the nature of VPS's claims, we review the factual allegations in the pleadings, the evidence adduced in support of those allegations, and the type of relief sought. *See Newsom v. Brod*, 89 S.W.3d 732, 734 (Tex. App.—Houston [1st Dist.] 2002, no pet.). Artful pleading does not alter the underlying nature of a claim. *See Omaha Healthcare Ctr., LLC v. Johnson*, 344 S.W.3d 392, 394 (Tex. 2011) (discussing principle in context of health care liability claims). In its original petition, VPS asserted that Village Place executed a promissory note that Yari guaranteed and that after default and foreclosure, "a deficiency [was] still owing under the Note, in the amount of $373,920.44 . . . ." In its second amended petition, VPS deleted the allegation regarding a deficiency on the loan and specifically asserted that it was "not seeking to recover a deficiency from" Village Place or Yari because the loan was non-recourse "subject to" the carveout-liabilities provisions. The original and second amended petition both alleged that the deed of trust imposed obligations on Village Place (and Yari, per the guaranty) to not commit waste, to keep the property in good repair, and to deliver tenants' advance rentals and security deposits and both alleged breach of contract claims.

Despite the new theory alleged by VPS, we conclude that the nature of its claims remained as stated in the original petition: VPS sought to recover the

25

"deficiency," as that term is defined in section 51.003, remaining after foreclosure.[11] As we have already determined, the carveout-liabilities provisions do not impose additional liability for Village Place. Rather, they conditionally restore personal liability on Village Place for breach of the obligations created by the loan documents—such as the obligations to pay principal and interest, taxes and insurance. Village Place would have no personal liability for these obligations but for the carveout-liabilities provisions. Village Place's restored liability is limited by the unpaid loan balance and VPS's other covered expenses.

We conclude that insofar as VPS sought to recover damages under the carveout-liabilities provisions for reductions in the value of the pledged property,

---

[11] VPS relies on *Wells Fargo Bank, N.A. v. HB Regal Parc, LLC*, 383 S.W.3d 253 (Tex. App.—Dallas 2012, no pet.), which was a suit to collect on a non-recourse note brought by Orix, as servicing agent, on behalf of a noteholder. Like this case, the note contained "certain 'carve outs' or exceptions under which the lender would have the right to recover from the borrower." *Id*. at 256. The trial court concluded that the borrower did not breach the carveout-liabilities provisions and therefore "the loan remained a non-recourse obligation." The court of appeals concluded that because the loan remained non-recourse, "the amount of any deficiency between the value of the property at foreclosure and the amount of the loan is irrelevant." *Id*. at 261. This one sentence—without any analysis—does not control the result here. First, the terms of the carveout-liabilities provisions there were different than the terms here; the provisions there did not include the suffered or incurred language upon which we rely. Second, because the loan remained non-recourse, the borrower had no liability and thus the property's value was not an offset for determining the unpaid loan balance. In this case, in contrast, the loan became, in part, a recourse loan because Village Place breached its contractual obligations covered by the carveout-liabilities provisions; the question here is the amount for which the borrower became personally liable. And because of that personal liability here, we must address the impact of section 51.003, an inquiry that apparently was unnecessary in *Wells Fargo*.

VPS was seeking in substance recovery for a loan "deficiency": "the unpaid balance of the indebtedness secured by the real property" less "the price at which real property is sold at a foreclosure sale." TEX. PROP. CODE ANN. § 51.003(a) (West 2007). Accordingly, we hold that section 51.003 applies in this case.

**C.     VPS did not establish waiver of Yari's rights under section 51.003 as a matter of law**

VPS argues that the guaranty signed by Yari expressly waived his rights to an offset under section 51.003. The trial court did not find a waiver by Yari. Therefore, VPS has the burden of demonstrating waiver as a matter of law. *See Dunn v. Dunn*, 177 S.W.3d 393, 396–97 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) (stating that when party attacks legal sufficiency of adverse finding on which it had burden of proof, party must establish all vital facts in support of issue as matter of law)**.** VPS failed to do so.

VPS relies, in its initial brief, on section 5(j) of the guarantee. That section provides in pertinent part:

The Guarantor[] unconditionally waive[s] the following:

. . . .

(j)     any rights or defenses based upon an offset by the Guarantor against any obligation now or hereafter owed to the Guarantor by Borrower . . . .

VPS compares this waiver clause to a purportedly similar waiver clause that was deemed to have waived rights under section 51.003 in a Fifth Circuit opinion,

*LaSalle Bank Nat'l Ass'n v. Sleutel*, 289 F.3d 837 (5th Cir. 2002). Yari argues that the waiver at issue in *LaSalle* was much broader than the one in this case, which does not waive section 51.003 rights.

In *LaSalle*, the guarantor signed a guaranty agreement containing the following clause:

> To the extent allowed by applicable law, Guarantor expressly waives and relinquishes all rights and remedies now or hereafter accorded by applicable law to guarantors or sureties, including, without limitation: . . . (III) any defense, right of offset or other claim which Guarantor may have against Borrower or which Borrower may have against Lender or the Holder of the Note; . . . and (VI) all rights of redemption, homestead, dower, and other rights or exemptions of every kind, whether under common law or by statute.

*LaSalle*, 289 F.3d at 840. The issue before the Fifth Circuit was whether the Legislature permitted rights under section 51.003 to be subject to waiver by a guarantor, and the court concluded that they were. *See id.* at 841–42. The parties apparently did not dispute that if such a waiver were legally possible, the clause effectively waived the guarantor's rights under section 51.003.[12] The issue in this case, however, is whether the guaranty agreement contains language effective to waive Yari's rights under section 51.003.

By the guaranty language above, Yari waived offset rights based upon obligations owed by Village Place ("Borrower") to him. But the clause does not

---

[12] The *LaSalle* court mentioned in dicta that the clause "of course" waived any right of offset that may be had under section 51.003. *LaSalle Bank Nat'l Ass'n v. Sleutel*, 289 F.3d 837, 842 (5th Cir. 2002).

mention waiver of potential offset rights with respect to the lender or noteholder. Section 51.003 grants rights to the borrower in order to ensure that collateral is sold for its fair market value; it does not impose obligations on the borrower. A guaranty agreement is "strictly construed . . . and will not be extended by construction or implication." *Coker*, 650 S.W.2d at 394 n.1. Moreover, it "should be given a construction which is most favorable to the guarantor," Yari. *Id.* Accordingly, we hold that section 5(j) does not waive Yari's rights under section 51.003 with respect to VPS.

Shortly before argument, VPS changed its argument. Now it contends that Yuri waived his right to the statutory protections of section 51.003 in two different paragraphs in section 4 of the guaranty. The first paragraph provides that the guaranty's obligations "shall not be subject to any . . . set-off . . . based upon any claim the Guarantor may have against Lender [VPS] or Borrower [Village Place]."

The second paragraph in section 4 provides that VPS's exercise or non-exercise of any of its rights shall not "give the [Guarantor] . . . any recourse or defense against Lender [VPS]." VPS does not identify, however, any right that it exercised (or failed to exercise) that forms the basis for the statutory protections of section 51.003. Section 51.003's statutory rights are for the protection of the borrower, not the lender. Accordingly, we hold that section 4 does not waive Yari's rights under section 51.003 with respect to VPS.

**Sufficiency of Evidence Supporting Fair-Market-Value Finding**

## A. The parties' contentions

The next question is whether there is legally and factually sufficient evidence to support the trial court's finding that VPS's foreclosure bid of $1.5 million was "consistent with" the fair market value.[13] Village Place asserts that the evidence overwhelmingly establishes that the property's fair market value at foreclosure far exceeded VPS's winning foreclosure bid of $1.5 million. Therefore, Village Place argues, when a correct fair market value is applied to offset VPS's claim, VPS's damages are either reduced or eliminated. VPS responds that the trial court's finding that the foreclosure bid of $1.5 million was "consistent with" the fair market value was supported by the evidence.

## B. Competent evidence of fair market value

The term "fair market value" as used 51.003 is not statutorily defined. *See* TEX. PROP. CODE ANN. § 51.0001 (West Supp. 2012) (providing several definitions but not "fair market value"). That said, "market value" is defined in other contexts as "the price the property will bring when offered for sale by one who desires to sell, but is not obliged to sell, and is bought by one who desires to buy, but is under no necessity of buying." *City of Harlingen v. Estate of Sharboneau*, 48 S.W.3d 177, 182 (Tex. 2001) (quoting *State v. Carpenter*, 89 S.W.2d 979, 979, *modifying*

---

[13] For the purposes of this appeal only, we assume that this is a finding that the property's fair market value at the time of foreclosure was $1.5 million.

89 S.W.2d 194, 202 (1936)); *Exxon Corp. v. Middleton*, 613 S.W.2d 240, 246 (Tex. 1981) (same); *cf.* TEX. TAX CODE ANN. § 1.04(7) (West 2008) (for Tax Code purposes, defining "market value" in similar terms). This court and other courts of appeals have used the same definition for "fair market value." *See, e.g.*, *Burns v. Rochon*, 190 S.W.3d 263, 270 (Tex. App.—Houston [1st Dist.] 2006, no pet.); *Henson v. Reddin*, 358 S.W.3d 428, 436 (Tex. App.—Fort Worth 2012, no pet.). And our sister court has used this same definition in the context of section 51.003. *See Preston Reserve, L.L.C. v. Compass Bank*, 373 S.W.3d 652, 658 (Tex. App.— Houston [14th Dist.] 2012, no pet.). We, too, adopt the foregoing definition for the term "fair market value" as used in section 51.003.

Section 51.003 provides that the "fair market value shall be determined by the finder of fact after the introduction by the parties of competent evidence of value." TEX. PROP. CODE ANN. § 51.003(b) (West 2007). It also enumerates, without limitation, several types of competent evidence:

> (1) expert opinion testimony; (2) comparable sales; (3) anticipated marketing time and holding costs; (4) cost of sale; and (5) the necessity and amount of any discount to be applied to the future sales price or the cashflow generated by the property to arrive at a current fair market value.

*Id.* "The three traditional approaches to determining market value are the comparable sales method, the cost method, and the income method." *City of Harlingen*, 48 S.W.3d at 182 (citing *Religious of the Sacred Heart v. City of*

31

*Houston*, 836 S.W.2d 606, 615–17 n.14 (Tex. 1992)). "In certain circumstances, a fourth method, the subdivision development method, may also be used." *City of Sherman v. Wayne*, 266 S.W.3d 34, 48 (Tex. App.—Dallas 2008, no pet.) (citing *City of Harlingen*, 48 S.W.3d at 186)).

Evidence of the purchase price of property can be some evidence of its value. *See, e.g.*, *Edlund v. Bounds*, 842 S.W.2d 719, 728 (Tex. App.—Dallas 1992, writ denied); *Burris v. Krooss*, 563 S.W.2d 875, 879 (Tex. Civ. App.—Eastland 1978, no writ). However, "evidence of what property sold for at a foreclosure sale is not competent evidence of its fair market value, since the transaction is not a free one between a willing seller and a willing buyer." *SPT Fed. Credit Union v. Big H Auto Auction, Inc.*, 761 S.W.2d 800, 801–02 (Tex. App.—Houston [1st Dist.] 1988, no writ) (quoting *Price v. Gulf Atl. Life Ins. Co.*, 621 S.W.2d 185, 187 (Tex. Civ. App.—Texarkana 1981, writ ref'd n.r.e.)); *accord Preston Reserve,* 373 S.W.3d at 663. Also, evidence of the property's purchase price during a different time period is not competent evidence of fair market value unless it is accompanied by evidence showing the circumstances of the sale, such as how the property was marketed and comparability of market conditions. *See Preston Reserve*, 373 S.W.3d at 663; *see also Broesche v. State*, 348 S.W.2d 770, 772 (Tex. Civ. App.—Houston 1961, no writ) (observing that when actual purchase date is too remote, purchase price is not competent evidence of value); *cf. Z.A.O., Inc. v. Yarbrough*

*Drive Ctr. Joint Venture*, 50 S.W.3d 531, 547 (Tex. App.—El Paso, 2001, no pet.) (holding that evidence of real property's "current" rental value was not evidence of rental value during relevant time period). An unaccepted offer to purchase is not competent evidence of fair market value. *Hanks v. Gulf, Colo. & Santa Fe Ry. Co.*, 320 S.W.2d 333, 336–37 (Tex. 1959); *Preston Reserve*, 373 S.W.3d at 664; *Sw. Bell Tel. Co. v. Wilson*, 768 S.W.2d 755, 762 (Tex. App.—Corpus Christi 1988, writ denied).

**C.      There was legally insufficient evidence that the property's fair market value was $1.5 million at the time of foreclosure**

We now consider the sufficiency of the evidence of the property's fair market value. The parties dispute what evidence concerning fair market value was properly admitted at trial, but in this case we do not need to resolve the admissibility issue in order to resolve the sufficiency issue. Assuming, without deciding, that all the testimony and evidence concerning the property's fair market value were properly admitted, we conclude that there was legally insufficient evidence that the property's fair market value was $1.5 million at the time of foreclosure.

### 1.    Britt's testimony

VPS presented two witnesses to testify regarding the property's fair market value: Steve Britt and John Marshall. Britt and Marshall are both asset managers employed by ORIX Capital Markets, LLC, which is the manager of VPS. In anticipation of foreclosure, Britt prepared a recommendation on how much to bid on the property at the foreclosure sale. He recommended an opening foreclosure bid of $1 million up to a maximum bid of $1,875,000. At the foreclosure sale, VPS and one other party bid on the property. The other party's maximum bid was $1,250,001, while VPS made the winning bid of $1.5 million. Britt did not provide any testimony that the property's fair market value was a certain amount or fell within a certain range at the time of foreclosure.

VPS's winning bid of $1.5 million at the foreclosure sale is not itself competent evidence of fair market value because the sale was not a free one between the buyer and seller. *See SPT*, 761 S.W.2d at 801–02. Similarly, Britt's range of recommended foreclosure bids does not indicate the property's fair market value because, even at the maximum end, it contemplates a seller (the substitute trustee) who is obligated by the terms of the deed of trust to sell the property. *See id.* Moreover, there was no evidence concerning how the property was marketed leading up to the foreclosure sale. *See Preston Reserve*, 373 S.W.3d at 663. The unaccepted third-party bid of $1,250,001 also was not competent evidence of value

because of the foreclosure context in which the bid was made and because it was unaccepted. *See SPT*, 761 S.W.2d at 801–02; *Preston Reserve*, 373 S.W.3d at 664.

### 2. Marshall's testimony

After foreclosure, Marshall was involved in marketing the property and approving its resale to third parties. During the ten months between foreclosure and subsequent resale, VPS expended approximately $20,000 on repairs and maintenance. VPS and a third party contracted for a selling price of $2 million, but the prospective buyer "terminated" the contract upon discovering an environmental condition. Shortly thereafter, VPS and another third party contracted for a selling price of $2 million, but that was subsequently reduced by $50,000 due to the environmental condition such that the final closing price was $1,950,000. Like Britt, Marshall did not provide any testimony that the property's fair market value was a certain amount or fell within a certain range.

The first resale offer of $2 million did not result in a consummated sale. It is no evidence of fair market value because the buyer was ultimately not a "willing" one. *See Preston Reserve*, 373 S.W.3d at 664.

As to the final closing price of $1,950,000, we realize that the property's purchase price at a later date can sometimes serve as some evidence of fair market value. *See Burris*, 563 S.W.2d at 879. However, the record here does not reflect the necessary additional evidence that would permit a reasonable inference that the

property's fair market value was only $1.5 million at the time of foreclosure, ten months earlier. After taking title to the property with a winning bid of $1.5 million, VPS expended only $20,000 in repairs. There was no evidence that these improvements enhanced the fair market value by $450,000. Nor was there any evidence that market conditions had markedly changed between the foreclosure date and the resale date. Thus, even assuming that the final resale price of $1,950,000 is some evidence of fair market value, it does not in itself support a finding that the property's fair market value was $1.5 million, or $450,000 less, at the time of foreclosure. *Cf. Preston Reserve*, 373 S.W.3d at 663 ("Evidence of the property's sale price of $980,000 a year after the foreclosure sale also is not competent evidence of fair market value" in part because "[t]here is no evidence regarding how the property was marketed a year later and whether market conditions were comparable . . . .").

### 3. Brokers' opinions of value and appraisals

In carrying out their respective responsibilities, Britt and Marshall had reviewed two brokers' opinions of value (BOV) and an appraisal prepared by outside firms: Collier's BOV, dated ten months before foreclosure, estimated the property's value between $3.5 million and $4.25 million; Moody Rambin's BOV, dated nine months before foreclosure, estimated the property's value between $3,488,660 and $3,987,040; and Greenbriar's appraisal, dated four months before

36

foreclosure, estimated the property's value at $4,675,000. These reports were admitted into evidence. The Collier, Moody Rambin, and Greenbriar reports assumed that the property could achieve "stabilized" occupancy rates of 87%, 75%, and 85%, respectively. At the time of foreclosure, the property had an actual occupancy rate of 27% or less. None of the reports expressly reflected that they accounted for unperformed repairs or environmental conditions revealed during inspections undertaken in connection with the property's resale.

The trial court also admitted into evidence the same appraisal that Village Place had attached to its motion requesting a determination of fair market value and offset. The appraisal, prepared by a certified general real estate appraiser, estimated the property's fair market value at $3,184,002.50. It assumed a "stabilized" occupancy rate of 85%.

VPS argues that the fair-market-value estimates in the BOVs and appraisals are too high because they do not account for the 27% actual occupancy, the unperformed maintenance, and the environmental condition of the property. Britt, Marshall, and Yari testified that the occupancy level and physical condition of the property can impact its fair market value. No one testified about a methodology by which to adjust the BOVs and appraisals to account for potentially faulty assumptions and thereby arrive at a value of $1.5 million.

We must "closely scrutinize" any appraisal technique differing from the traditional methods approved by the Texas Supreme Court. *See City of Harlingen*, 48 S.W.3d at 187. Whatever technique the trial court may have used with respect to the BOVs and appraisals, it would not have been one of the three traditional techniques for assessing fair market value. *See Religious of the Sacred Heart of Tex.*, 836 S.W.2d at 615 (overviewing three traditional techniques). Without any evidence about a reliable methodology for adjusting the BOVs and appraisals to arrive at an accurate fair market value, the court's implied departure from those reports represents a "leap entirely outside of the evidence in answering" the fair market value question, *Callejo v. Brazos Elec. Power Coop., Inc.*, 755 S.W.2d 73, 75 (Tex. 1988), which it cannot do. Accordingly, to the extent that the court may have found the fair market value by taking an estimate from one or more BOVs or appraisals and adjusting it downward, the finding lacks legally sufficient evidence.

### 4. Pre-foreclosure offers to purchase the note

After default but before foreclosure, ORIX listed the property for sale on its web site without stating an asking price. It received six offers to purchase the note for between $725,000 and $1,500,000, none of which was accepted. Also during this time period, Village Place offered to purchase the note for approximately $1,540,000; the offer was not accepted.

The pre-foreclosure bids to purchase the note are not competent evidence, first because they are unaccepted offers, *Preston Reserve*, 373 S.W.3d at 664, and second because they are offers to buy the note rather than the property itself. The prospective buyer of the note bargains for the rights of a noteholder, not of a real property owner. A third-party noteholder would not own the property outright; upon foreclosure, its ownership would be contingent upon making the winning bid and the possibility that the foreclosure would be set aside. Even if Village Place had purchased the note against its own property, it has not actually purchased the property (which it already owns); rather, it has effectively purchased the release of its debt.

For the foregoing reasons, we hold that there was legally insufficient evidence that the property's fair market value at the time of foreclosure was $1.5 million.

**Liabilities Arising Out of the Non-Recourse
Exceptions Are Not "Other Expenses" to Which the
Foreclosure Proceeds Should Have Been First Applied**

**A.    The parties' contentions**

As an alternative argument against its liability, Village Place argues that the guaranty contains a clause whose operation extinguishes VPS's claims. That clause, delineating the priority in which proceeds from the foreclosure sale should be applied, states in pertinent part:

> If Lender exercises its power of sale set forth in the Deed of Trust or otherwise realizes upon the collateral given by Borrower or any other person as security for the Loan, then all proceeds . . . shall be applied [1] first to Lender's cost of collection, attorney's fees, court costs, and other expenses, [2] then to accrued but unpaid interest on the Note, [3] then to that portion of the unpaid principal balance of the Note that is not guaranteed by Guarantors, and [4] finally to the remaining principal balance of the Note that is guaranteed by Guarantors.

Village Place argues that by process of elimination, the carveout liabilities are not [2] unpaid interest on the note, or [3] the unguaranteed portion of the unpaid principal balance on the note, or [4] the guaranteed portion of the remaining principal balance on the note; therefore, the carveout liabilities must fall within [1] "Lender's . . . other expenses," which is the category to which the foreclosure proceeds must be first applied. It argues that because the foreclosure proceeds of $1.5 million far exceed the carveout liabilities and other items in the first category, the carveout liabilities are extinguished upon the foreclosure.

VPS responds that Village Place's reading of the guaranty's priority clause would render the guaranty a nullity. VPS asserts that the final category—"the guaranteed portion of the remaining balance on the note"—is the category into which the carveout liabilities fall, and because the sale proceeds were insufficient to extinguish the first three categories, there are no proceeds remaining to be applied to the carveout liabilities.

40

We adopt neither side's interpretation of the guaranty's clause regarding the priority of foreclosure proceeds. Instead, we conclude that the deed of trust's priority clause covers the carveout liabilities found by the trial court.

**B.    The deed of trust's priority clause should be construed with the guaranty's priority clause**

Village Place's argument that the carveout liabilities fall within "other expenses" rests on their assumption that the guaranty's priority clause "gives an exclusive list of the four categories to which foreclosure proceeds can be applied . . . ." The deed of trust, however, also contains a clause on the priority of foreclosure proceeds, a clause that states:

> Trustee shall apply the proceeds of the [foreclosure] sale in the following order, (a) to all reasonable costs and expenses of the sale, including, but not limited to, reasonable and customary Trustee's fees, reasonable attorney's fees and costs of the title evidence; (b) to all sums secured by this instrument in such order as the Lender, in Lender's sole discretion, directs, and (c) the excess, if any, to the person legally entitled thereto.

It is a rule of contract interpretation that "separate instruments or contracts executed at the same time, for the same purpose, and in the course of the same transaction are to be considered as one instrument, and are to be read and construed together." *Jones v. Kelley*, 614 S.W.2d 95, 98 (Tex. 1981); *see also Vista Dev. Joint Venture II v. Pac. Mut. Life Ins. Co.*, 822 S.W.2d 305, 307 (Tex. App.— Houston [1st Dist.] 1992, writ denied) (applying rule to promissory note and deed of trust). We construe subclause (a) in the above quoted material as a parallel to the

41

first category of items in the guaranty's priority clause, namely, "[1] Lender's cost of collection, attorney's fees, court costs, and other expenses." Thus, when the loan documents are construed together, the deed of trust illuminates that the guaranty's phrase "Lender's . . . other expenses" is restricted to the "expenses of the [foreclosure] sale."

## C.     Ejusdem generis

Our interpretation is bolstered by the canon of ejusdem generis: "[W]hen words of a general nature are used in connection with the designation of particular objects or classes of persons or things, the meaning of the general words will be restricted to the particular designation." *Hilco Elec. Coop., Inc. v. Midlothian Butane Gas Co., Inc.*, 111 S.W.3d 75, 81 (Tex. 2003). The word "other" in the term "other expenses" renders that term one of a similar nature. *See Hilton v. Sw. Bell Tel. Co.*, 936 F.2d 823, 828 (5th Cir. 1991). Thus, connecting the phrase "other expenses" to the particular terms in the same subclause—"Lender's cost of collection, attorney's fees, [and] court costs"—we construe "other expenses" to be restricted to VPS's foreclosure-related costs; they do not include the diverse carveout liabilities awarded by the trial court, such as withheld security deposits and rents, unpaid taxes and insurance premiums, and costs of environmental testing reports.

A question remains about what priority the loan documents give to the carveout liabilities with respect to foreclosure proceeds. We conclude that those carveout liabilities are encompassed within "all sums secured by this instrument" contemplated in the deed of trust's priority clause.[14] Under that clause, VPS has "sole discretion" to direct the application of foreclosure proceeds; therefore, it is not required to apply the proceeds first to the carveout liabilities.

We hold that the priority clauses in the guaranty and deed of trust do not require the foreclosure proceeds to be first applied to the carveout liabilities awarded by the trial court.

## Attorney's Fees

Village Place argues that a reduction in VPS's damages warrants a reduction in the amount of attorney's fees awarded. The factors governing an award of attorney's fees include consideration of the "results obtained." *Young v. Qualls*, 223 S.W.3d 312, 314 (Tex. 2007) (per curiam) (quoting *Arthur Anderson & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex. 1997)). A meaningful reduction in the amount of damages on appeal may support remand for a new trial on attorney's fees. *See, e.g.*, *Powell Elec. Sys., Inc. v. Hewlett Packard Co.*, 356 S.W.3d 113, 129 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (citing *Barker v. Eckman*, 213

---

[14] The deed of trust indicates that the instrument "SECURE[S] TO LENDER . . . (d) the performance of the covenants and agreements of Borrower herein contained . . . ." Thus, the carveout liabilities are part of the sums secured by the deed of trust instrument.

S.W.3d 306, 314 (Tex. 2006), and *Young*, 223 S.W.3d at 314–15). Although we do not render judgment concerning VPS's total damages, we recognize that our disposition on the question of VPS's damages may result in a meaningful reduction of those damages on remand. Accordingly, we remand for a new trial on attorney's fees, as well. *See id.*

## Conclusion

We affirm the trial court's award of $109,720.90, subject to an offset based on the property's fair market value. We reverse in part the damages awarded in the judgment to the extent of $554,258.60 and hold that the damages for any reduction in the value of the collateral are limited to the unpaid loan balance after offsetting the property's fair market value. We reverse the awards of attorney's fees. We remand for a new trial to determine the property's fair market value and the offset, if any, that Village Place is entitled to under section 51.003 of the Texas Property Code. We remand for a new trial on attorney's fees, as well.


Harvey Brown
Justice

Panel consists of Chief Justice Radack and Justices Higley and Brown.

44