**Opinion issued March 10, 2015**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-13-00615-CV

_____

**DONNA T. MOORE, DAVID B. MOORE, AND PROVIDENT FUNDING ASSOCIATES, LP D/B/A PROVIDENT HOME LOANS, Appellants**

**V.**

**BRENHAM READY MIX, INC., Appellee**

**On Appeal from the 155th District Court**
**Waller County, Texas**
**Trial Court Case No. 09-12-20105**

## O P I N I O N

In this case, Brenham Ready Mix, Inc., a supplier of ready-mix concrete and

fill dirt for the development of a residential subdivision, sought to foreclose upon

two materialman's liens on two lots owned by Donna T. and David B. Moore and Provident Funding Associates, LP *d/b/a* Provident Home Loans[1] (collectively, "the individual homeowners"). After a bench trial, the trial court ruled that Brenham Ready Mix could foreclose upon its liens in the amount of $214,757.76 against each of the lots, and the court awarded $75,000 in trial-level attorney's fees and $25,000 in conditional appellate attorney's fees. In three issues on appeal, the individual homeowners contend that (1) the trial court erroneously enforced the full amount of the liens, which represented materials used for the entire development project, against their individual lots; (2) Brenham Ready Mix did not perfect its lien for the concrete because it did not substantially comply with the statutory notice requirements; and (3) the trial court erred in awarding attorney's fees to Brenham Ready Mix due to the excessive-demand doctrine or, if the trial court properly awarded attorney's fees, the court erred in the amount awarded because Brenham Ready Mix did not segregate its fees relating to each particular property.

We reverse and remand.

---

[1] Brenham Ready Mix obtained a judgment against the only other individual homeowners who had bought lots in Phase 3, Brent Dirden and Christopher St. Mary, as well. While this appeal was pending, Brenham Ready Mix, Dirden, and St. Mary reached a settlement agreement, and Dirden and St. Mary moved to dismiss their appeal. We granted this motion and dismissed their appeal in an interlocutory order dated August 14, 2014.

## Background

Art DePue owned twenty-five acres of land in Prairie View, Texas. In 2002, DePue subdivided the land and filed a plat for the Brookside Meadow subdivision. DePue filed a replat of the subdivision in 2006, subdividing the land into seventy-one lots. L&F Homes and Development ("L&F") was the initial original contractor for the construction project, which involved, among other things, building duplexes on each of the lots.

Brenham Ready Mix supplies ready-mix concrete and other materials for residential and commercial construction projects. In early 2006, Felix Meyer, Brenham Ready Mix's president, met with David Solomon of L&F, who was the project manager for the Brookside Meadow project, and George Mott of Mott Concrete, Inc., the subcontractor that had a contract with L&F to provide and pour the concrete to be used for the slabs, sidewalks, and parking lots in the subdivision. Meyer quoted a price for concrete to Mott, and Brenham Ready Mix entered into a subcontract on an open-account basis with Mott to provide ready-mix concrete for the entire development. Brenham Ready Mix's contract with Mott did not specify the amount of concrete to be used on each specific lot, and it did not "enter into any contracts that were specific to lots."

The construction project was divided into three phases. Mott paid Brenham Ready Mix for the concrete provided for Phases One and Two, and there is no

3

dispute in this litigation about those two phases. Phase Three involved thirty-seven lots, and Brenham Ready Mix delivered concrete for this phase in July and September 2007.[2] During construction, Mott would inform Brenham Ready Mix of how much concrete it needed for the next day, Brenham Ready Mix would deliver that amount to the jobsite, and Mott would direct and pour the concrete. Brenham Ready Mix generally billed Mott monthly, although it occasionally billed more frequently if it had delivered a large volume of concrete. Mott failed to pay for $206,661.76 worth of the concrete deliveries in July and September. The trial court admitted several unpaid invoices from Brenham Ready Mix to Mott dated throughout August, September, and October 2007.

During construction, DePue sold the Phase Three property to L&F, which then sold the property to Jim Fitchett on September 12, 2007. Around September 2007, Stability Homes replaced L&F as the general contractor on the project.[3] Solomon, the project manager for L&F, remained the manager for the project.

---

[2] Brenham Ready Mix also delivered concrete to the project in December 2007. By that point, Terra Estrada had replaced Mott as the concrete subcontractor, and Terra Estrada paid Brenham Ready Mix upfront for these deliveries. There is no dispute in this litigation concerning these deliveries of concrete.

[3] The record does not indicate the precise date that Stability Homes replaced L&F as the general contractor on the project. David Solomon testified that he was the project manager for Stability Homes on the project from September 2007 through January 2008 and that he had previously been involved with the project prior to September 2007. This is the only testimony relevant to this question that is contained in the record.

After Mott failed to pay the outstanding invoices for the concrete, Brenham Ready Mix retained attorney Katherine Kenjura to prepare a lien. Kenjura sent a notice letter regarding Brenham Ready Mix's lien on the concrete to Mott, the subcontractor for the concrete, Stability Homes, the then-current general contractor for the project, and DePue, the former owner of the Phase Three property, on November 21, 2007. She sent a second notice letter on December 18, 2007, to L&F, the former general contractor for the project, Stability Homes, and Mott. Meyer testified that Brenham Ready Mix provided its outstanding invoices solely to Mott. Thus, the November 21, 2007 notice letter was the first written notice Brenham Ready Mix provided to entities other than Mott. It had not sent any notice letters before Stability Homes became the general contractor for the project. And it did not send the November 21, 2007 notice letter to L&F. Instead, Solomon, the project manager for both L&F and Stability Homes, testified by deposition that Meyer spoke with him in "September, October, around the end of October, first of November of 2007" and informed him that Mott had not paid Brenham Ready Mix for the concrete.

By January 2008, Brenham Ready Mix had finished all of the concrete deliveries to the project. It then entered into a second contract, this time with Stability Homes, the general contractor, to provide fill dirt to the site. This contract, like Brenham Ready Mix's initial contract with Mott, the concrete

5

subcontractor, required Brenham Ready Mix to provide fill dirt to the entire development, not to specific lots within the development. Stability Homes failed to pay Brenham Ready Mix $8,096 for the fill-dirt deliveries, so Brenham Ready Mix filed another lien affidavit for these materials. All of the fill-dirt deliveries occurred in January 2008, and Kenjura sent the notice letter for this lien on January 30, 2008.

On January 9, 2008, Brenham Ready Mix filed an "Affidavit Claiming Mechanic's and Materialman's Lien" for the ready-mix concrete, averring that it had an unpaid claim in the amount of $206,661.76 for labor and materials furnished. This affidavit specifically listed each lot in Phase Three. Brenham Ready Mix listed L&F as the "owner or reputed owner" of the property, identified Stability Homes as the original general contractor, and identified Mott as the subcontractor. The affidavit further stated that Brenham Ready Mix had sent notice of the claimed lien to L&F by certified mail on November 21, 2007, and December 18, 2007. Brenham Ready Mix sent notice of the lien affidavit to L&F, Stability Homes, and Mott.

Brenham Ready Mix filed an affidavit claiming a lien for the fill dirt on February 13, 2008. This affidavit again specifically listed each lot, named L&F as the owner or reputed owner, and listed Stability Homes as both the original general contractor and as subcontractor for the fill dirt. This affidavit stated that Brenham

6

Ready Mix had sent notice of the claimed lien to L&F by certified mail on January 30, 2008.

Beginning in March 2008, individuals began to purchase lots in the subdivision from Jim Fitchett, who had purchased the property in September 2007. The individual homeowners offered Brenham Ready Mix approximately $5,800 to release the liens claimed on their property. This amount represented 1/37th of the total amounts claimed by Brenham Ready Mix in the two liens, representing the relation of the individual lot to the total number of lots in Phase Three of the project. The individual homeowners arrived at this amount based on the theory that the individual lots were no longer owned by the original owner of the entire unplatted property, L&F, which had benefited from the delivery of the entire amount of concrete and fill dirt delivered to the property. The individual homeowners reasoned that each lot received 1/37th of the total amount of ready-mix concrete and fill dirt provided by Brenham Ready Mix to the project and that each homeowner should, therefore, be liable, if at all, for only that proportionate share of the liens, and not for the entire value of the liens on the entire property. Brenham Ready Mix rejected these partial payments and instead demanded payment of the full lien totals placed on the property for deliveries made to benefit the entire subdivision as a condition of releasing the lien as to the individual lot owners.

Regions Bank provided construction financing for Phase Three of the project. It held liens superior to those of Brenham Ready Mix on all of the property in the subdivision. On November 4, 2008, Regions Bank foreclosed on its liens on the thirty-four lots in Phase Three that remained unsold at that time. Regions Bank then released the liens it held on the three lots that had been sold to individual homeowners, including the two lots that are the subject of this dispute.

Joseph Garnett, Brenham Ready Mix's counsel, testified concerning attorney's fees. He testified that charges billed to Brenham Ready Mix totaled $118,070.71. He also stated that Brenham Ready Mix originally filed three separate suits to foreclose on its liens relating to the three separate properties at issue and that, as a result, he had segregated the fees incurred for each suit up until the time the trial court consolidated the three suits. After that point, he no longer segregated his fees by property.

In its final judgment, the trial court rendered judgment in favor of Brenham Ready Mix. Specifically, the trial court ordered that Brenham Ready Mix "have foreclosure of its liens in the amount of $214,757.76" on each of the current homeowners' properties. The court issued an order of sale of the current homeowners' properties to satisfy the judgment. The trial court also awarded Brenham Ready Mix $75,000 in trial-level attorney's fees and $25,000 in conditional appellate-level attorney's fees.

8

The trial court also issued findings of fact and conclusions of law, several of which the current homeowners challenge on appeal. This appeal followed.

**Standard of Review**

Findings of fact in a bench trial have the same "force and dignity as a jury's verdict upon questions." *Village Place, Ltd. v. VP Shopping, LLC*, 404 S.W.3d 115, 124 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (quoting *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991)). As a result, the trial court's findings of fact are subject to sufficiency challenges under the same standards that we use in evaluating the sufficiency of evidence to support a jury verdict. *Id.* Unchallenged findings of fact are binding on the parties and on this Court. *Id.*

To determine whether legally sufficient evidence supports a challenged finding of fact, we consider evidence favorable to the finding if a reasonable fact-finder could consider it, and we disregard evidence contrary to the challenged finding unless a reasonable fact-finder could not disregard it. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005); *Village Place*, 404 S.W.3d at 124. We sustain a legal sufficiency challenge only if the record demonstrates: (1) a complete absence of evidence of a vital fact; (2) the court is barred by the rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla;

9

or (4) the evidence conclusively establishes the opposite of the vital fact. *City of Keller*, 168 S.W.3d at 810; *Village Place*, 404 S.W.3d at 124.

In determining whether factually sufficient evidence supports a challenged finding, we consider and weigh all of the evidence and set aside the judgment only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Village Place*, 404 S.W.3d at 124 (citing *Arias v. Brookstone, L.P.*, 265 S.W.3d 459, 468 (Tex. App.—Houston [1st Dist.] 2007, pet. denied)). The trial court, as the fact-finder in a bench trial, is the sole judge of the credibility of the witnesses. *Id.* (citing *HTS Servs., Inc. v. Hallwood Realty Partners, L.P.*, 190 S.W.3d 108, 111 (Tex. App.—Houston [1st Dist.] 2005, no pet.)).

We review conclusions of law de novo, and we will uphold the trial court's conclusions if the judgment can be sustained on any legal theory supported by the evidence. *Id.* (citing *Noble Mortg. & Invs., LLC v. D & M Vision Invs., LLC*, 340 S.W.3d 65, 74–75 (Tex. App.—Houston [1st Dist.] 2011, no pet.)). Conclusions of law are not subject to challenge for factual insufficiency, but we may review the legal conclusions drawn from the facts to determine their correctness. *Id.* (citing *Brown v. Brown*, 236 S.W.3d 343, 348 (Tex. App.—Houston [1st Dist.] 2007, no pet.)).

## Substantial Compliance with Notice Requirements

In their second issue, the individual homeowners contend that Brenham Ready Mix failed to perfect its materialman's lien with respect to the concrete because it did not substantially comply with the statutory written notice requirements for materialman's liens and, therefore, the lien is invalid.[4]

A subcontractor, or, as in this case, a supplier to a subcontractor, is a derivative claimant and, unlike a general contractor, has no constitutional, common law, or contractual lien on the owner's property. *See First Nat'l Bank in Graham v. Sledge*, 653 S.W.2d 283, 285 (Tex. 1983). As a result, a subcontractor's lien rights "are totally dependent on compliance with the statutes authorizing the lien." *Id.*; *Indus. Structure & Fabrication, Inc. v. Arrowhead Indus. Water, Inc.*, 888 S.W.2d 840, 844 (Tex. App.—Houston [1st Dist.] 1994, no writ). The Texas Supreme Court has recognized, however, that substantial compliance with the statutes "is sufficient to perfect a lien . . . ." *Sledge*, 653 S.W.2d at 285.

Property Code section 53.056 sets out the notice requirement for lien claimants who are not general contractors. *See* TEX. PROP. CODE ANN. § 53.056 (Vernon 2014). This section provides that if the lien claim arises, as here, from a

---

[4] The individual homeowners do not contend that Brenham Ready Mix failed to substantially comply with the statutory notice requirements with respect to its materialman's lien for the fill dirt.

debt incurred by a subcontractor, the claimant must give the original contractor[5] written notice of the unpaid balance not later than the fifteenth day of the second month following each month in which all or part of the claimant's material was delivered. *Id.* § 53.056(b). The claimant must then give the same notice to the owner or reputed owner of the property and the original contractor not later than the fifteenth day of the third month following each month in which all or part of the claimant's material was delivered. *Id.* Section 53.056(f) provides that "[a] copy of the statement or billing in the usual and customary form is sufficient as notice under this section." *Id.* § 53.056(f). The "liberal construction" of the materialman's liens statutes "does not excuse failure to comply with the statutory requirement that the materialman provide 'timely written notice.'" *Wesco Distrib., Inc. v. Westport Grp., Inc.*, 150 S.W.3d 553, 558 (Tex. App.—Austin 2004, no pet.).

### A. July 2007 Deliveries

For the concrete that Brenham Ready Mix delivered to the worksite in July 2007, Brenham Ready Mix was required to give written notice of the claim to the original contractor, Stability Homes, by September 15, 2007, which was the

---

[5] The Property Code defines "original contractor" as "a person contracting with an owner either directly or through the owner's agent." *See* TEX. PROP. CODE ANN. § 53.001(7) (Vernon 2014). The Property Code defines "subcontractor" as "a person who has furnished labor or materials to fulfill an obligation to an original contractor or to a subcontractor to perform all or part of the work required by an original contract." *Id.* § 53.001(13).

fifteenth day of the second month following the month in which Brenham Ready Mix delivered part of its materials. *See* TEX. PROP. CODE ANN. § 53.056(b). As evidence that it complied with the statutory notice requirement for the July 2007 deliveries, Brenham Ready Mix points to David Solomon's deposition testimony in which he stated that, as project manager for both L&F and Stability Homes, he received and approved the invoices from suppliers, that Felix Meyer, Brenham Ready Mix's president, approached him in "September, October and early November about the unpaid invoices," and that he saw "additional documents" from Meyer to substantiate Brenham Ready Mix's claims during conversations occurring from September through early November 2007.

Solomon testified that his general duties as project manager included "inspecting and the processing [of] invoices" relating to the project. He also testified that he first saw information relating to Brenham Ready Mix's claim when Meyer "first told [him], hey, I didn't get paid." According to Solomon, that occurred in "September, October, around the end of October, first of November of 2007." Solomon then testified that, with regard to L&F's and Stability Homes' subcontracts with Mott, his job as project manager did not involve "looking at invoices and paying invoices" because L&F and Stability Homes had a turnkey contract with Mott. As a result, Mott gave Solomon "one price for the whole thing," Mott supplied all the labor and materials to complete its contractual

13

obligations, and Solomon was not "privy [to] what [Mott] actually pays for each and how much [Mott] buys." Mott turned in one bill to the original contractor when it completed work on a specific phase of the project.

Brenham Ready Mix did not present any specific testimony or other evidence that Solomon, on behalf of either L&F or Stability Homes, the two original contractors on the project, received written notice of Brenham Ready Mix's lien claim for the concrete delivered in July 2007, either in the form of an unpaid invoice or otherwise, by September 15, 2007. Even if Solomon had actual notice by September 15, 2007, that Brenham Ready Mix had not been paid, an issue we need not determine, courts have held that "liberal construction [of the materialman's liens statute does] not save the materialman's lien from his failure to provide timely written notice." *Wesco Distrib.*, 150 S.W.3d at 558 (citing *Tex. Constr. Assocs., Inc. v. Balli*, 558 S.W.2d 513, 518–19 (Tex. Civ. App.—Corpus Christi 1977, no writ)). As the Austin Court held in *Wesco Distribution*, "[l]iberal construction cannot read the timing requirements out of the statute." *Id.* Because the record contains no evidence that Brenham Ready Mix notified the general contractor, Stability Homes, of its lien claim with regard to the July 2007 deliveries of concrete by written notice on or before September 15, 2007, as required by Property Code section 53.056(b), we conclude that the trial court erroneously

14

determined that Brenham Ready Mix substantially complied with the statutory notice requirements with respect to these deliveries.

We sustain the individual homeowners' second issue with respect to the July 2007 concrete deliveries.

### B. September 2007 Deliveries

For the concrete that Brenham Ready Mix delivered to the worksite in September 2007, Brenham Ready Mix was required to give written notice of the claim to Stability Homes, the general contractor, by November 15, 2007, which was the fifteenth day of the second month following the month in which Brenham Ready Mix delivered part of its materials. It is undisputed that Brenham Ready Mix sent a written notice dated November 21, 2007, to Mott, Stability Homes, and Art DePue concerning its claim. Brenham Ready Mix contends that it satisfied the statutory notice requirement because Solomon testified that he received and approved invoices for the project and that "Meyer showed him documents about the unpaid invoices in September, October, and early November."

As stated above with respect to the July deliveries, Solomon testified that he did not receive invoices relating to the concrete subcontract with Mott because Stability Homes had a turnkey contract with Mott and only received one bill from Mott at the end of each phase of construction. Solomon testified that, while in conversation with Meyer, he "[thought he] saw a copy of all this stuff" in

15

"September, October, around the end of October, first of November of 2007," but Meyer testified that Brenham Ready Mix did not send copies of outstanding invoices to any party other than Mott, and he agreed that the November 21, 2007 notice letter "was the first written notice that [Brenham Ready Mix] provided to the entities involved in the delivery of ready mix material other than Mott Concrete." Meyer specifically agreed that the November 21, 2007 letter "would have been the first notice to the owner of the original contract"—Stability Homes—and that "[t]here were no notice letters sent before November 21st, 2007." Furthermore, Katherine Kenjura, the attorney who prepared the notice letters and handled the filing of Brenham Ready Mix's lien claims, had the following exchange with the current homeowners' counsel:

> [Counsel]: So it's true, isn't it, that Stability Homes was not given notice of this claim by the 15th day of the second month after September 2007, that's true, isn't it?
>
> [Kenjura]: They were not given notice.
>
> [Counsel]: That's what I said, Stability did not receive that notice, did they?
>
> [Kenjura]: They did not.

Even if Solomon's deposition testimony supports an argument that Stability Homes had actual notice that Brenham Ready Mix had not been paid for its September 2007 deliveries, as we have already held with respect to the July 2007 deliveries, actual notice of an unpaid claim does not satisfy the statutory notice

16

requirements of section 53.056. *See Wesco Distrib.*, 150 S.W.3d at 558; *Balli*, 558 S.W.2d at 518–19. Brenham Ready Mix presented evidence that Stability Homes received written notice of the unpaid claim on November 21, 2007, but it did not present any evidence that Stability Homes received written notice before November 15, 2007, the relevant date pursuant to section 53.056.

Furthermore, to the extent Brenham Ready Mix contends that, because the current homeowners do not challenge the trial court's fact finding that Art DePue, the initial reputed owner of the property, received timely notice of the lien claim, this finding obviates the need to provide proper statutory notice to Stability Homes, the general contractor, we note that our sister courts have rejected this argument. Notice to the general contractor "is the only notice that the original contractor personally receives" and is "for the benefit of the original contractor." *Wesco Distrib.*, 150 S.W.3d at 560; *Stone Fort Nat'l Bank v. Elliott Elec. Supply Co.*, 548 S.W.2d 441, 445–46 (Tex. Civ. App.—Tyler 1977, writ ref'd n.r.e.) (holding that materialman did not substantially comply with notice requirement relative to general contractor even though materialman properly and timely provided notice to owner of property).

Based on the record, we conclude that the trial court erroneously determined that Brenham Ready Mix substantially complied with the statutory requirement to provide timely written notice to Stability Homes, the general contractor, pursuant

17

to Property Code section 53.056. Because Brenham Ready Mix did not substantially comply with the statutory notice requirements with regard to its lien for ready-mix concrete, we hold that that lien is invalid. *See Wesco Distrib.*, 150 S.W.3d at 561 (affirming trial court's decision that materialman's lien was invalid for failure to substantially comply with statutory notice requirements).

We sustain the individual homeowners' second issue in its entirety.

### Enforcement of the Liens

In their first issue, the individual homeowners contend that the trial court erred by enforcing the full amount of both of Brenham Ready Mix's materialman's liens, which covered concrete and fill dirt delivered and used on all thirty-seven lots in Phase Three, against their individual lots.[6] They argue that the extent of Brenham Ready Mix's lien on their individually-owned lots is limited by the proportionate share of the entire property represented by their lots as defined on the recorded subdivision plats and that the total amount of the lien against the entire property cannot be applied to each lot sold individually. Instead, the trial court can only apply the value of the proportion of the materials used on each lot in relation to the total value of the lien on the entire property.

---

[6] Because we have already held that Brenham Ready Mix's lien for concrete is invalid due to its failure to substantially comply with the statutory notice requirements, we analyze only whether the entire amount of Brenham Ready Mix's fill-dirt lien can be enforced against each individual lot.

Brenham Ready Mix contends that because it delivered materials to the project pursuant to a single contract with the contractor, the contract did not designate which materials were to be used on which lot, and it was not paid by the lot, the lien may extend to more than one lot and the aggregate amount of the lien may be applied to each lot. The individual homeowners respond that the amount of actual materials used on the entire property is immaterial. It is the proportionate share of the value of the *lien* that is at issue, not the proportionate value of the actual amount of materials used. We agree with the individual homeowners.

Texas Property Code Chapter 53 governs materialman's liens. *See* TEX. PROP. CODE ANN. §§ 53.001–.287 (Vernon 2014). A mechanic's or materialman's lien is a "lien created by law on real estate, and the improvements thereon, to secure persons who, within the intent of the law, have labored or furnished material, machinery, fixtures, or tools to erect or repair the improvements." *Efficient Energy Sys., Inc. v. J. Hoyt Kniveton, Inc.*, 631 S.W.2d 538, 540 (Tex. App.—El Paso 1982, no writ). Courts liberally construe the statutes providing for materialman's liens "for the purpose of protecting laborers and materialmen." *Sledge*, 653 S.W.2d at 288.

A materialman has a lien on property if it furnishes labor or materials for construction of a house, building, or improvement, and it "furnishes the labor or materials under or by virtue of a contract with the owner or the owner's agent,

19

trustee, receiver, contractor, or subcontractor." TEX. PROP. CODE ANN. § 53.021(a) (Vernon 2014). Section 53.022(a) provides that "[t]he lien extends to the house, building, fixtures, or improvements, . . . and to each lot of land *necessarily* connected or reclaimed." *Id.* § 53.022(a) (Vernon 2014) (emphasis added). Section 53.022(c) specifies that "[a] lien against land in a city, town, or village extends to each lot on which the house, building, or improvement is situated or on which the labor was performed." *Id.* § 53.022(c). The Property Code does not define "lot." The Texas Supreme Court has stated, however, that the term "lot" "usually refers to a parcel of land as marked on a plat or survey." *Valdez v. Diamond Shamrock Ref. & Mktg. Co.*, 842 S.W.2d 273, 275 (Tex. 1992). The Property Code also does not define "necessarily." The construction of that term is a matter of first impression for this Court.

The law in this area derives from the Texas Supreme Court's 1887 decision in *Lyon v. Logan*, a case decided well prior to the enactment of Property Code Chapter 53. In *Lyon*, the Texas Supreme Court held that "[w]hen materials have been furnished under a single contract for buildings erected on two or more contiguous lots owned by the person to whom the material is furnished, we see no reason why the lien should not attach to all the lots." 5 S.W. 72, 74 (Tex. 1887). The court reasoned that, when materials are furnished to multiple lots owned by the same person or entity, the property owner controls how much of the materials

20

are used on each lot, and if the owner does not make separate contracts for each lot, "he cannot be heard to say that a lien does not attach upon all the lots upon which the material is used." *Id.*

The Texas Supreme Court later emphasized that the land, even if divided or platted into multiple lots, must be continuous and must be treated as one unit under the contract for the materialman's lien to attach to all. *Guar. Sav. Loan & Inv. Co. v. Cash*, 91 S.W. 781, 783 (Tex. 1906) (holding that lien attached to two contiguous lots for which improvements were contracted but did not attach to non-contiguous lot on which improvements were made); *see also Oil Field Salvage Co. v. Simon*, 168 S.W.2d 848, 853 (Tex. 1943) (holding that "[w]here different lots or tracts of land are contiguous, and are treated as a single tract, the lien statutes do not require the affidavit and account to stipulate on which tract the material was delivered or used"; and that lien attaches to whole).

The Texas Supreme Court revisited the issue of the scope of the lien in *Valdez*. In *Valdez*, the property owner owned a 7.9 acre tract of land, on which Valdez poured and fabricated concrete pursuant to a subcontract on the entire tract while it was singly owned. 842 S.W.2d at 274. While Valdez was working at the property, the owner replatted the land into a 7.1 acre tract and a 0.8 acre tract and sold the 0.8 acre tract to Diamond Shamrock. *Id.* All of Valdez's work occurred on the 7.1 acre tract, but he claimed a lien covering the entire 7.9 acres to which he

21

had agreed to supply concrete. *Id.* The Texas Supreme Court ultimately concluded that the term "lot," as used in section 53.022, "refers to a single tract of land as recorded in the county deed records" and held that Valdez had a properly perfected lien that extended "to the lot that existed when construction began—the entire undivided 7.9 acres." *Id.* at 275. The court also stated that a financing agreement reflecting the division of the property, which had been entered into before construction began and which was not filed in the real property records, did not "serve the same legal purposes of a duly recorded replatting," and, as a result, Valdez "had no reason to believe anything other than that Opus owned the 7.9-acre tract as an undivided lot." *Id.*; *see also Habitat, Inc. v. McKanna*, 523 S.W.2d 787, 789 (Tex. Civ. App.—Eastland 1974, no writ) (holding that trial court correctly applied full amount of lien to forty-two lots on which materialman provided plumbing materials to owner for townhouses).

All of the foregoing cases hold that a materialman's lien attaches to the entire contiguous property, or tract, on which the owner contracted to have the materials used. But none addresses the issue presented by this case: the *enforcement* of the value of a lien that attached to undivided property against subsequent purchasers of a specified portion of the tract, here the subsequent owners of individual lots in a subdivision platted into individual lots prior to the

delivery of the materials but sold after the material had been supplied to the entire undivided property.

Brenham Ready Mix contends that because the lots in Phase Three were contiguous, because it delivered the materials to the project pursuant to a single contract, and because the contract did not specify the amount of materials to be used on each specific lot, the entire amount of the fill-dirt lien can be enforced against any given individual lot. We agree that the lien *attached* to all the properties. The law established in *Lyon* and its progeny is clear: a materialman who provides goods and services to a property owner may place a lien for the value of unpaid materials and labor on all the "necessarily connected" lots, i.e., all lots that are contiguous and owned by a single owner at the time the work is done. *See Lyon*, 5 S.W. at 74. But the issue is not whether the lien could be placed on the entire property to which materials were supplied when all the lots were contiguous *and* the property was owned by a single owner. The issue is whether the lien may be *enforced* in its entirety against the subsequent purchasers of individual lots of the property.

As the Texas Supreme Court noted in *Cash*, a case which involved two contiguous lots and one non-contiguous lot,

> The leading purpose running through [the predecessor statutes to Property Code Chapter 53] is to secure persons furnishing labor or materials in improving land by a lien upon that into which the labor or material has entered; i.e., the structures and the land to which they are

23

attached. . . . Evidently the statute contemplates *one improvement*, *constituting an entirety*, to be affected by the lien to secure the value of the work, material, etc., which made it, and not that one improvement is to be charged [with] the cost of an entirely different one.

91 S.W. at 782 (emphasis added). In discussing *Lyon*, the court noted that several lots "constituted one continuous body or area which the owner, disregarding artificial divisions, had the right to treat as a unit." *Id.* at 783. The court then turned to whether the lien could be extended to the third, non-adjoining lot. The court noted that "[t]he lien is not given by contract but by the statute, and that does not make the character of the contract at all important." *Id.* The court stated:

[The statute] attaches the lien to an improvement upon land, treating the land and the improvement as one, for the labor and material which have gone into such improvement, and because they have gone into it, and not because of the particular form of contract under which it was done. *The lien is given upon the house, building, improvement, etc., and upon the 'lot or lots' of land, or the 'tract' of land necessarily connected therewith. This refers the inquiry to the facts existing and not to the contracts of the parties. The contract cannot change the actual situation of parcels of land separated from each other by intervening lands and make them one; nor can it locate upon or necessarily connect with one an improvement actually made on the other*, and yet this would have to be done in order, under the terms of the statute, to give the lien claimed upon all for improvements upon each.

*Id.* (emphasis added). The supreme court reversed the judgment extending the lien to all three lots and remanded the case to give the materialman an opportunity to establish "a lien upon each of the lots with its improvement for the price of the labor and material expended on it." *Id.*

24

Here, it is undisputed that the concrete and fill dirt delivered to the Brookside Meadow subdivision were all contracted for by the then sole owner of the entire property and were intended by the owner to benefit the entire property. However, before Brenham Ready Mix began delivering materials to Phase Three, Art DePue, the owner of the property, filed a plat and a replat of Phase Three with the Waller County Clerk's office. These documents divided Phase Three into thirty-seven individual lots. *See* TEX. PROP. CODE ANN. § 13.002(1) (Vernon 2014) ("An instrument that is properly recorded in the proper county is . . . notice to all persons of the existence of the instrument . . . ."). The plat changed the operative existing facts. *See Cash*, 91 S.W. at 782. Thus, in contrast to *Valdez*, at the time Brenham Ready Mix delivered the materials to the project, although DePue was still the record owner of the property, he had already platted and replatted the property into thirty-seven separate lots for the Brookside Meadow subdivision. Brenham Ready Mix was therefore on notice that DePue owned the property as divided lots that composed the Brookside Meadow subdivision and that the plat contemplated the sale of the lots as individual lots to individual property owners. In other words, Brenham Ready Mix was on notice that ownership of the property on which the lien had attached would not *necessarily* remain in the same owner's hands but might be transferred to a single future owner of the whole or many individual owners of separate portions of the property.

25

Thus, although the lots of Phase Three were contiguous and a single contract governed Brenham Ready Mix's delivery of materials to the project, allowing Brenham Ready Mix to treat all thirty-seven lots of the subdivision as one, such that its lien attached to all of the lots in Phase Three, without regard for the amount of the materials used to improve the particular lot, it does not follow that Brenham Ready Mix could enforce the full amount of its lien against any and all subsequent purchasers of individual lots.

It is undisputed that the materials delivered by Brenham Ready Mix to the project were not solely applied to one particular lot in Phase Three; instead, the materials were applied to each of the thirty-seven lots. We therefore conclude, under the particular facts of this case, that Brenham Ready Mix may not enforce the full value of its fill-dirt lien against any individually-owned lot but may instead only enforce its fill-dirt lien to the proportion the individual improved lot bears to the entire tract. *See id.* at 782 ("Evidently the statute contemplates one improvement, constituting an entirety, to be affected by the lien to secure the value of the work, material, etc., which made it, and not that one improvement is to be charged [with] the cost of an entirely different one.").

Were we to hold otherwise, a cascade of absurd and unreasonable results would follow in violation of the rules of statutory construction and the case law applying those rules. *See* TEX. GOV'T CODE ANN. § 311.021(3) (Vernon 2013)

26

("In enacting a statute, it is presumed that . . . a just and reasonable result is intended . . . ."); *In re Blair*, 408 S.W.3d 843, 848 (Tex. 2013) (orig. proceeding) ("[C]ourts will not interpret statutes to work absurd results.").

First, the purchaser of an individual unit in a multi-million-dollar complex of condominiums or a mixed-use development or a subdivision could—as here—be held liable for the entire value of a debt incurred by someone else for the benefit not simply of the individual property purchased but for all contiguous property in the project benefitted by the original owner's contract with a materialman. The result could be—as it is here—the court-ordered enforcement of the entire value of the lien against an individual lot owner for many times the value of the labor and materials proportionately supplied to the property purchased by that individual lot owner. And the result could well be—again, as it is here—the court-ordered sale of the individual lot owner's property to satisfy a debt incurred by another on a much larger piece of property than that owned by the person against whom the debt is enforced.

Such a result also allows for multiple recoveries of the same total value of the lien against multiple individual property owners, violating the one-satisfaction rule. *See Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 303 (Tex. 2006) ("'There can be but one recovery for one injury, and the fact that . . . there may be

more than one theory of liability[] does not modify this rule.'") (quoting *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 8 (Tex. 1991)).

For all of the foregoing reasons, we conclude that the trial court erroneously determined that Brenham Ready Mix could enforce the full value of its fill-dirt lien against either of the current individual homeowners' lots. And we find support for our conclusion as far back as *Lyon*. In that seminal 1887 case, the supreme court held, "So long as [the owner of the entire property] treats each lot as one property, by making one contract for material to be used on all of them . . . , so long may the material-man treat the lots as one piece of property in fixing his lien upon it." *Lyon*, 5 S.W. at 74.

We now hold that the converse is also true. Once the owner no longer treats the lots encumbered by a materialman's lien as one piece of property by retaining ownership of the whole, then, although the lien is fixed upon the entire property and its scope extends to future purchasers, the value of the debt secured by any individual lot, or individual portion of the property divided and sold to another owner, must be proportioned to the percentage of the individual property or lot purchased relative to the entire property subject to the lien.

Because the debt of an individual purchaser of a lot or individual portion of the encumbered property must be treated proportionately to the area of the property purchased, it follows that the debt is *not* apportioned to the value of the actual

28

amount of fill-dirt supplied to the individual lot against which the lien is sought to be enforced when the property was undivided and owned by one owner. This conclusion too is supported by *Lyon*. *See id.* (stating that, although lien attached to all contiguous lots that benefitted from materials and labor supplied under owner's contract with materialman, "it would be exceedingly unreasonable to require the person who furnishes the material in such a case to ascertain how much of the material [was] placed in each house," as this was "a matter under the control of the owner of the property improved").

We hold that when an improvement has been made to an entire undivided property, a materialman's lien has attached to the whole, and an individual portion of the encumbered property, such as a lot, is subsequently sold to an individual homeowner or lot owner, the court must apportion the value of the lien to the percentage of the property purchased by that individual owner to determine the value of the lien enforceable against the individual owner. We therefore hold in this case that the percentage of the value of the fill-dirt lien for which the individual homeowners are liable is restricted to the individual homeowner's pro rata share of the total value of the lien.

We sustain the individual homeowners' first issue.[7]

---

[7]    Because we conclude that Brenham Ready Mix's concrete lien is invalid and that the trial court improperly enforced the full amount of the fill-dirt against each of

## Conclusion

We reverse the judgment of the trial court awarding Brenham Ready Mix foreclosure of the full amount of both of its liens and attorney's fees, render judgment that Brenham Ready Mix's concrete lien is invalid, and remand the case to the trial court to determine the dollar amount of the fill-dirt lien that can be enforced against each of the individual homeowners' properties.

 

Evelyn V. Keyes
Justice

Panel consists of Chief Justice Radack and Justices Jennings and Keyes.

---

the current homeowners' properties, we vacate the trial court's award of attorney's fees in favor of Brenham Ready Mix.